IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:21-cv-149-GMG-RWT |
| UFP RANSON, LLC, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Richard L. Etter (admitted *pro hac vice*)
Cory E. Ridenour
One PPG Place - Suite 1900
Pittsburgh, PA 15222

PHILILIPS, GARDILL,
KAISER & ALTMEYER, PLLC

Edward M. George, III
61 Fourteenth Street
Wheeling, WV 26003

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS

    A.  UFP Ranson has established EEO Policies and complaint procedures ........................ 3

    B.  The Claimant's experiences and UFP Ranson's remedial measures ........................... 4

        1.  Kevin Ross ......................................................................................... 4

        2.  Andrea Stitt ........................................................................................ 5

        3.  Patrice Stitt ........................................................................................ 6

        4.  Gregory Giles ..................................................................................... 7

        5.  Margaret Mullins ................................................................................ 8

        6.  Jarius Styles ....................................................................................... 8

        7.  Eric Davis .......................................................................................... 9

LEGAL STANDARD ................................................................................................. 9

ARGUMENT

    A.  The Claimants' Racial Harassment Claims Fail as a Matter of Law ........................... 10

        1.  No basis exists to impute liability to UFP Ranson for the alleged race-based co-worker harassment ............................................................... 11

        2.  The race-based co-worker harassment experienced by each claimant is not sufficiently severe or pervasive, as a matter of law. ............................ 18

    B.  Davis's Claims That He Was Terminated Because of His Race and Alleged Protected Activity Fail as a Matter of Law .................................................... 26

        1.  The EEOC cannot establish a prima facie race discrimination case ................. 27

        2.  The EEOC cannot establish a prima facie  race retaliation case ...................... 28

        3.  The EEOC cannot present evidence from which a reasonable jury could conclude that UFP Ranson's reasons are a pretext ................................ 30

CONCLUSION ............................................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).......................................................................9

*Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) ...............................................................................20

*Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) ..................................20

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) ....................................10

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 609 (4th Cir. 1999) ......................................29

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763, 118 S.Ct. 2257 (1998)................................19

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) .........................29

*Carter v. Ball*, 33 F.3d 450, 461–62 [4th Cir. 1994]................................................................................29

*Causey v. Balog*, 162 F.3d 795, 802 [4th Cir. 1998] ...............................................................................20

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .................................................................................9

*Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 232 (4th Cir. 2022) ......................................11

*Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted), *aff'd* 566 U.S. 30, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012) ...................................................27

*Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) .............................29

*Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)......................................29

*E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) ............................................19

*E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)................................................11

*E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011) ...............................................................10

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) .........................27

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275 (1998) .................................18

*Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255-56 (4th Cir. 2015).............................................12

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) ................27

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) .....................................26

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993) ...................................................18

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000) ............................................................20

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)....................27

*Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 336 (4th Cir. 2006) ..................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986..........................10

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ..........................26

*McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817 ......................................................................30

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ............................................................18

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, 118 S.Ct. 998 (1998)...............................18

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019)....................................................11, 19

*Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003 ..............................................................................28

*Rodgers v. W.S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ........................................................19

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ...............................................20

*Strothers v. City of Laurel, Md.*, 895 F.3d 317, 332 (4th Cir. 2018) .................................................11

## I.    __INTRODUCTION__

The Equal Employment Opportunity Commission ("EEOC") initiated this action following its investigation of a charge of discrimination filed by Eric Davis ("Davis") alleging that he had suffered discrimination, harassment, and retaliation based on his age, religion, race, and alleged protected activity during his employment with UFP Ranson, LLC ("UFP Ranson"). Following its investigation, the EEOC attempted to conciliate on behalf of Davis and four class members, only one of which is a claimant in this case.  Thereafter, the EEOC filed a four-count complaint in this Court alleging that UFP Ranson violated Title VII of the Civil Rights Act of 1964 by subjecting Davis to a hostile work environment because of his religion and race (Count I), subjecting Ross to a racially hostile work environment (Count II), subjecting a class of unidentified Black employees to a racially hostile work environment (Count III), and discharging Davis because of his race and in retaliation for filing a charge with the EEOC (Count IV).

This Court should grant summary judgment in favor of UFP Ranson on Counts II and III for two reasons.  First, no basis exists for imputing liability to UFP Ranson for the alleged racial harassment experienced by each claimant because (i) UFP Ranson cannot be held vicarious liable as none of the claimants were harassed by a supervisor, (ii) UFP Ranson did not have actual or constructive knowledge of the alleged harassment, and/or (iii) UFP took remedial action reasonably calculated to stop any alleged harassment once it received notice of such conduct.  There is no dispute that at all relevant times UFP Ranson maintained policies and procedures strictly forbidding racially harassment, and maintained complaint procedures for reporting any such harassments.  There is also no dispute that in response to complaints of racial harassment made pursuant to those policies and procedures, UFP Ranson took prompt investigative and remedial action reasonably designed to bring an end to such harassment.  Such

remedial action including discharging employees determined to have violated UFP Ranson's policies prohibiting racial harassment. These facts compel the conclusion that reasonable minds cannot differ as to the reasonableness and sufficiency of UFP Ranson's remedial actions. As such, liability cannot be imputed to UFP Ranson as a matter of law.

Second, the alleged race-based harassment experienced by each claimant was, as a matter law, not sufficiently severe or pervasive to constitute a hostile work environment.[1] As each claimant testified, the alleged harassers were not supervisors, the alleged harassment did not involve threats or intimidation, and the allegedly harassing conduct experienced by each claimant did not impact his or her ability to successfully perform his or her job. As discussed more fully below, the claimants' testimony demonstrates that the conduct they each claim to have experienced, although contrary to UFP Ranson's values and policies, was—as a matter of law—not sufficiently severe or pervasive to be legally cognizable under Title VII.

UFP Ranson is also entitled to summary judgment on Count IV. UFP Ranson terminated Davis's employment because, despite multiple opportunities to improve his work performance, he failed to increase his productivity and continued to engage in personal conversations during working time. For its part, the EEOC cannot present evidence that would enable a reasonable jury to conclude that UFP Ranson's stated reasons were mere pretext and that discriminatory or retaliatory animus were the real reasons for Davis's discharge.

For the foregoing reasons, UFP Ranson respectfully requests that this Court grant its motion and enter summary judgment in its favor on Counts II, III, and IV. UFP Ranson acknowledges that questions of material fact exist precluding summary judgment on Count I.

---

[1] Through the discovery process, the EEOC has voluntarily withdrawn its claims on behalf of three claimants, leaving seven claimants (Eric Davis, Kevin Ross, Margaret Mullins, Andrea Stitt, Patrice Stitt, Gregory Giles, and Jarius Styles) for whom it is asserting racial harassment claims.

## II.   STATEMENT OF FACTS[2]

### A.   UFP Ranson has established EEO policies and complaint procedures.

UFP Ranson is a lumber processing facility in Jefferson County, West Virginia.  *See*

Garrison Dep. at 13:1-11.  Most of the positions at UFP Ranson are manual labor roles, and

turnover at the facility is relatively high, and the total employee headcount has ranged from 130

to 180.  *Id.* at 13:20-15:10.  Micah Garrison (White) has been the General Manager of

Operations since January 1, 2020 (prior to that he was the Plant Manager), Daniel Hines (White)

is Plant Manager, and Kenneth Ruffner, Jr. (White) is the Production Manager.  *Id.* at 13:1-11.

UFP Ranson has adopted, posted, and distributed a comprehensive Equal Employment

Opportunity, Non-Discrimination, Non-Harassment policy ("Non-Harassment Policy")

prohibiting discrimination and harassment because of, among other things, race and religion,

which includes a detailed complaint procedure.

> Any person(s) who believes they may have been unlawfully discriminated against
> or harassed in violation of this policy or applicable law, is encouraged to first
> discuss the matter with his or her immediate supervisor or facility manager. If,
> for any reason, an employee does not want to discuss the matter with his or her
> immediate supervisor or facility manager, they should bring the matter to the
> attention of the vice president of human resources. Complaints of discrimination,
> including retaliation and harassment, brought to the attention of the vice president
> of human resources will be investigated in a prompt and professional manner.
> Managers, supervisors and all other employees are required to cooperate fully
> with these investigations and resolutions. Individuals who violate this policy will
> be subject to discipline.

SUMF, ¶¶ 1-2.  The Non-Harassment Policy is discussed during new employee training, is

reviewed as part of the Employee Handbook, and is posted on the bulletin boards at UFP

Ranson.  *Id.*

---

[2] Pursuant to LR Civ. P. 7.02(a), a Statement of Undisputed Material Facts ("SUMF") demonstrating that
there are no genuine issues of material fact is filed herewith, and is incorporated herein by reference.

In the interest of advancing its commitment preventing and correcting unlawful discrimination and harassment, UFP Ranson has also adopted, posted, and distributed an Open Door Policy and a Notice to Employees of Confidential Hotline.  SUMF, ¶¶ 3-4.  The Open Door Policy states, "If the employee's supervisor does not provide a prompt, thorough or satisfactory response, the employee may bring the issue to a higher authority without fear of reprisal or retaliation."  SUMF, ¶ 3.  The Notice to Employee of Confidential Hotline provides a confidential, anonymous hotline, as well as a toll-free 1-800 number to Corporate Human Resources, either of which can be used to submit complaints of unfair treatment, inappropriate conduct, or discrimination.  SUMF, ¶ 4.  The Open Door Policy and Notice of Confidential Hotline are included in the Employee Handbook and posted on the bulletin boards.  SUMF, ¶ 5.

Like every UFP Ranson employee, the claimants completed new hire orientation and training on or before their first day of work.  SUMF, ¶¶ 12-13, 33-34, 49-50, 78-79, 100-101, 123-124, 145-146.  As a result of this training, each claimant was aware of, and understood, the complaint procedures in the Non-Harassment Policy, the Open Door Policy, and Notice to Employees of Confidential Hotline.  SUMF, ¶¶ 14-15, 35-36, 51-52, 80-81, 102-103, 125-126, 147-148.  In addition, each claimant agreed to follow the procedures set forth in these policies in the event that he or she had problems relative to their employment at UFP Ranson.  *Id.*

**B.     The Claimant's experiences and UFP Ranson's remedial measures.**

**1.     Kevin Ross**

Ross was employed by UFP Ranson on three separate occasions.  SUMF, ¶ 29.  In late 2018, Ross voluntarily resigned his employment to take a job with another employer and then quit that job to come back to UFP Ranson.  *Id.* at ¶ 30.  After UFP Ranson discharged Ross for

4

being off company property while on the clock, Ross returns to UFP Ranson to plead with Garrison to give him another chance and hire him back for a third stint. *Id.* at ¶¶ 31-32.

Nobody at UFP Ranson ever used the N-word around Ross, nobody at UFP Ranson ever directed any racial remarks or jokes at Ross; nobody at UFP Ranson ever attempted to threaten or intimidate Ross, and nobody at UFP Ranson ever treated Ross less favorably than a White coworker. *Id.* at ¶¶ 37-40. Ross never witnessed anyone at UFP Ranson being treated unfairly or inappropriately, and Ross never heard a supervisor use the N-word. *Id.* Ross told the EEOC that he was not aware of any supervisor who had ever observed any racial harassment at UFP Ranson, and that UFP Ranson would investigate reports of use of the N-word and would take disciplinary action against anyone found to have used that word. *Id.* at ¶ 37. Ross testified that nothing that occurred at UFP Ranson ever affected his ability to satisfactorily perform his job duties. *Id.* at ¶¶ 46.

### 2.    Andrea Stitt

Other than the two comments discussed below, Andrea Stitt never had any racial epithets or any offensive or inappropriate raced-based comments directed at her at UFP Ranson, and never witnessed racial epithets or any offensive or inappropriate raced-based comments directed at any other UFP Ranson employee. SUMF, ¶¶ 67-68. A. Stitt also never had any racist jokes directed at her, and never had anyone threaten or attempt to intimidate her; nor did she ever hear any racist jokes or witness any UFP Ranson employee attempt to threaten or intimidate another employee. *Id.* In addition, A. Stitt testified that no current or former UFP Ranson employee ever told her that they were subjected to racial epithets, racist jokes, threats or intimidation, or any offensive or inappropriate raced-based comments at UFP Ranson. *Id.* at ¶ 69.

A. Stitt experienced two inappropriate race-based comments but she was unable to identify the employee who made the comments. *Id.* at ¶¶ 53-60. The first comment, which happened during her first two weeks, involved the use of the N-word. When A. Stitt reported the comment to her supervisor, she asked to be transferred to work with her sister or cousin, and her supervisor granted that request. *Id.* Two to three weeks later, the same employee called her a "Black motherfucker." *Id.* at ¶ 56. A. Stitt did not report the second comment to her supervisor, but she did tell a coworker. *Id.* at ¶¶ 57-58. As a result of the second comment, Stitt asked that she only be required to work with her sister or cousin going forward. *Id.* at ¶ 59. Her request was granted, and after that she worked only with her sister. *Id.* at ¶ 60. According to A. Stitt, she worked in close quarters with the employee who made the comments on two occasions for a grand total of 10-12 minutes. *Id.* at ¶ 61. In addition, she convinced her sister and cousin, both of who are black, to come work at UFP Ranson. *Id.* at ¶ 71. Near the end of her employment, A. Stitt posted a video showing the three of them "having fun" at UFP Ranson. *Id.* at ¶ 70.

### 3. Patrice Stitt

During her time at UFP Ranson, Patrice Stitt never had any racial epithets, including the N-word, directed at her; never had any racist jokes directed at her; never had anyone threaten or attempt to intimidate her; never had any offensive or inappropriate raced-based comments directed at her; and was never treated less favorably than a White coworker. SUMF, ¶ 82. Similarly, she never witnessed any UFP Ranson employee make any offensive or inappropriate raced-based comments, never witnessed any UFP employee tell a racist joke, never witnessed any UFP Ranson employee threaten or attempt to intimidate another employee; and never witnessed any UFP Ranson employee being treated less favorably than a coworker. *Id.* at ¶ 83. Additionally, no current or former UFP Ranson employee ever told P. Stitt that they were

subjected to racial epithets, racist jokes, threats or intimidation, or any offensive or inappropriate raced-based comments at UFP Ranson. *Id.* at ¶ 84. With respect to the video taken by her sister, P. Stitt testified that it showed them (and their cousin) "having fun together" and "chilling" while doing their jobs at UFP Ranson. *Id.* at ¶ 94.

### 4. Gregory Giles

Giles testified that never he never had any racial epithets, including the N-word, directed at him; never had any racist jokes directed at him; never had anyone threaten or attempt to intimidate him; never had any offensive or inappropriate raced-based comments directed at him; and was never treated less favorably than a White coworker. SUMF, ¶ 104. Giles further testified that he never witnessed any current or former UFP employee tell a racist joke directed at another employee, and he could not recall ever witnessing any current or former UFP Ranson employee being treated less favorably than a coworker. *Id.* at ¶ 105. According to Giles, he witnessed two instances of inappropriate race-based comments at UFP Ranson, neither of which was directed at him, and both by White coworkers whom Giles was unable to identify. *Id.* at ¶ 106. Although Giles did not report either comment to UFP Ranson, a supervisor who learned of the second comment walked the offending employee off the property, and Giles never saw the employee again. *Id.* at ¶¶ 107-108. No current or former UFP Ranson employee ever told Giles that they were subjected to racial epithets, racist jokes, threats or intimidation, or any offensive or inappropriate raced-based comments at UFP Ranson. *Id.* at ¶ 110. Giles testified that the conduct and comments that he experienced at UFP Ranson never affected his ability to satisfactorily perform his job. *Id.* at ¶ 120.

### 5. Margaret Mullins

During her time at UFP Ranson, Mullins overheard a White coworker say the N-word out loud to nobody in particular on two occasions; and a Black coworker say the N-word once in a safety meeting, three times out loud to nobody in particular, and one to his daughter during a heated, personal conversation. SUMF, ¶¶ 133, 136. However, Mullins testified that no current or former UFP Ranson employee ever made any racial epithets, including using the N-word, that were directed at her; that no current or former UFP Ranson employee ever told any racist or race-based jokes directed at her; that no current or former UFP Ranson employee ever threatened or attempted to intimidate her; and that no current or former UFP Ranson employee ever made any offensive or inappropriate raced-based comments of any kind directed at her. *Id.* at ¶ 127. Mullins further testified that she never witnessed any UFP Ranson employee tell a racist joke, and never witnessed any UFP Ranson employee threaten or attempt to intimidate a Black employee. *Id.* at ¶ 128. When Mullins resigned from UFP Ranson, she sent an email stating, "I've made many friends and a lot of memories and have had many, many laughs. Thank you for your time, patience, consideration, I hate to leave." *Id.* at ¶¶ 140-141.

### 6. Jarius Styles

Jarius Styles testified that nobody ever threatened or attempted to intimidate him, that he never heard any racist jokes, and that nobody at UFP Ranson ever treated him less favorably than a White employee. SUMF, ¶ 149. Styles never witnessed anyone attempt to threaten or intimidate a Black employee, and never witnessed any Black employee be treated less favorably than a White employee. *Id.* at ¶ 157. Likewise, no current or former UFP Ranson employee ever told him that they were subjected to racist jokes or subjected to threats or intimidation, nor did any Black employee ever tell him that they were treated less favorably than a White employee.

*Id.* at ¶ 158.  According to Styles, a White coworker greeted him with "what's up, my nigga" approximately 10 times, and a different White coworker call him a "porch monkey" on one occasion.  *Id.* at ¶¶ 150-151.  Significantly, none of these comments affected Styles' ability meet, and exceed, the performance expectations for his job.  *Id.* at ¶ 159.

### 7.    Eric Davis

On May 28, 2020, Davis signed his Employee Development Report, which stated that Davis needed to improve productivity and stop standing around socializing during working time. SUMF, ¶ 20.  Prior to that, Davis had advised on multiple occasions by Garrison, Reece, and Will Ramon, the Safety Coordinator, about these same issues.  *Id.* at ¶¶ 20, 23.  Despite these facts, just a few days later, Davis was observed by Garrison once again standing around talking about non-work matters while the rest of the stacker crew was working.  *Id.* at ¶ 24.  As such, Garrison made the decision to terminate Davis's employment.  *Id.* at ¶¶ 25-26.  Davis claims that during the May 28 meeting he told Reece that he was going to the EEOC because Reece told him he had to wait 10 days to receive a copy of his Employee Development Report.  *Id.* at ¶ 27. Reece had no involvement in the decision to terminated Davis.  *Id.* at ¶ 28.

## III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial–whether, in other

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence establishing there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

## IV.  ARGUMENT

### A.   The Claimants' Racial Harassment Claims Fail As A Matter of Law

To survive summary judgment on a claim of a racially hostile work environment, the EEOC "must demonstrate that a reasonable jury could find the harassment (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011) (citation and internal quotation marks omitted); *see also Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 277 (4th Cir. 2015) (en banc).  In addition, the EEOC "must present sufficient evidence of a fourth element: that there is some basis for imposing liability" for the harassment on the employer." *Xerxes*, 639 F.3d at 668-69 (citation and internal quotation marks omitted); *see also Boyer-Liberto*, 786 F.3d at 277 (holding that plaintiff must establish that the harassment "is imputable to the employer.").

Significantly, the inquiry into objectively severe or pervasive abusive conduct must focus on the events that the plaintiff personally experienced. *Perkins v. Int'l Paper Co*., 936 F.3d 196, 210 (4th Cir. 2019) ("[E]xperiences of third parties about which the plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement."). Thus, the severe and pervasive prong must be analyzed separately for each claimant based on each of their personal experiences. *See id.*

### 1. No basis exists to impute liability to UFP Ranson for the alleged race-based co-worker harassment.

The claimants in this case were not, and do not claim to have been, subjected to harassment by any supervisory or managerial employee of UFP Ranson. The allegations instead focus entirely on the alleged actions of the claimant's nonsupervisory coworkers. To survive summary judgment on its coworker harassment claims, the EEOC "must show that [UFP Ranson] was negligent in controlling working conditions—that is, [UFP Ranson] knew or should have known about the harassment and failed to take effective action to stop it." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 332 (4th Cir. 2018) (internal quotation marks omitted); *see also E.E.O.C. v. Sunbelt Rentals, Inc*., 521 F.3d 306, 315 (4th Cir. 2008) (citations omitted).

The rule in the Fourth Circuit is that "an employer cannot avoid Title VII liability for [co-worker] harassment by adopting a 'see no evil, hear no evil' strategy," and that "[k]nowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 232 (4th Cir. 2022) (citations omitted). "Under this rule an employer may be charged with constructive knowledge of harassment when it fails to provide reasonable procedures for victims to register complaints." *Id.* (citation omitted).

Here, there is no dispute that UFP Ranson adopted, posted, and distributed an Equal
Employment Opportunity, Non-Discrimination, Non-Harassment policy and Open-Door Policy,
each of which includes clear complaint procedures that employees can use to report harassment
or discrimination.  SUMF, ¶ 1-2.  In addition, these policies and procedures are reviewed with
every as part of their new employee orientation and training.  *Id.* at ¶¶ 14-15, 35-36, 51-52, 80-
81, 102-103, 125-126, 147-148.  Each of the claimants confirmed that they were aware of and
understood the Non-Harassment and Open-Door policies.  *Id*.  UFP Ranson also established, and
posted notice of, an anonymous, confidential employee hotline that employees could also use to
report harassment or discrimination.  *Id.* at ¶¶ 3-5.

Because UFP Ranson had an established anti-harassment policy and reasonable
complaint procedures, the EEOC must present evidence sufficient to enable a reasonable juror to
conclude that UFP Ranson reasonably should have anticipated that each claimant would be
harassed by the particular alleged harasser—not whether the employer was aware of isolated
incidents that had allegedly occurred to other employees in other departments or at other
facilities by different alleged harassers.  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255-56
(4th Cir. 2015) (plaintiff must show that employer "anticipated or reasonably should have
anticipated that a *particular employee* would harass a *particular co-worker* and yet failed to take
action reasonably calculated to prevent *such harassment*") (emphases added; citation omitted).
Thus, the EEOC cannot meet its burden by showing that UFP Ranson was aware of, or should
have been aware of, isolated incidents that occurred to other claimants or employees, occurred in
other departments or at other facilities, or involved different alleged harassers.  *See Id.*

Here, the EEOC cannot present evidence that UFP Ranson should have been aware that
each of the claimants would experience the inappropriate comments or conduct that they

experienced.  Despite their awareness and understanding of UFP Ranson's policies prohibiting harassment and complaint procedures, none of the claimants reported the harassment they experienced to the Vice President of Human Resources, none of the claimants reported the harassment they experienced to the facility manager, and none of the claimants used the Human Resources 1-800 number or the anonymous or confidential hotline to report the harassment they experienced.  Thus, UFP Ranson had no knowledge of any harassment or potential harassment, other than what each claimant reported to his or her supervisor.  *See Foster*, 787 F.3d at 255-56.

However, even if knowledge is established, a plaintiff must still "present[] sufficient evidence to demonstrate that [the employer]'s responses to the complaints made under its policies were not reasonably calculated to end the harassment and, therefore, that liability for the harassment may be imputed to it." *Xerxes Corp.*, 639 F.3d at 669 (citation omitted).  "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." *Id.*  ("The cessation of harassment shows effectiveness, which in turn evidences such reasonable calculation.") (citation and internal quotation marks omitted).  In addition, "an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law." *Id.* (citation omitted).  Thus, if an employer's response fails to stop the harassment, that fact "does not, *ipso facto*, allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." *Id.* (citation omitted).  As the *Xerxes* court stated, "[p]laintiffs often feel that their employer could have done more to remedy the adverse effects of the employee's conduct." *Id.* at 674.  But Title VII does not prescribe specific action for an employer to take in response to racial harassment, as long as it is reasonably designed to be effective. *Id.* at 674-75.  As the Fourth Circuit has explained:

> So long as the employer's response to each known incident of coworker harassment is reasonably prompt, and the employer takes remedial measures that are reasonably calculated to end the harassment, liability may not be imputed to the employer *as a matter of law*.

*Id.* at 675 (emphasis added).

Here, the record is clear that UFP Ranson initiated prompt investigations and took effective remedial action in response to reports of racially offensive or harassing conduct made pursuant to its Non-Harassment Policy or its other published polices. SUMF, ¶¶ 7, 45, 54, 64, 92, 108, 152-153. Unfortunately, UFP Ranson cannot remedy harassment that the claimants failed to report pursuant to the procedures in these policies. Nor can it be held liable for such harassment. *Xerxes Corp.*, 639 F.3d at 674-75.

Ross made only one report of race-based conduct or comments to a supervisor or member of management. SUMF, ¶ 44. Specifically, Ross told Garrison that while walking to work he was called the N-word by an employee named Trevor. *Id.* Although he did not know what action Garrison took in response, Ross confirmed that Trevor never again harassed him or called him the N-word. *Id.* at ¶ 45; *see also* ¶ 37 (Ross's statements to the EEOC that he was not aware of any supervisor who had ever observed any alleged discrimination or harassment, and that UFP Ranson would investigate any reports of use of the N-word and would take disciplinary action against anyone found to have used that word). Accordingly, UFP Ranson's responses to Ross's complaint was adequate as a matter of law. *See Xerxes Corp.*, 639 F.3d at 669 ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law.").

A. Stitt similarly made only one report of race-based conduct or comments one report to her supervisor. SUMF, ¶ 54. When A. Stitt advised her supervisor that a coworker used the "N-word," she also told him that she would "feel comfortable" if she could be assigned to work with either her sister or her cousin. *Id.* Based on A. Stitt's comments, her supervisor reasonably

believed that reassigning her to work with her sister or cousin would remedy the issue.  So that is what he did.  *Id.*

The EEOC may argue that the supervisor's remedy was not effective because the same employee later called A. Stitt a "Black motherfucker."  But the reasonableness of UFP Ranson's remedial measures must be determined at the time the measure is taken—not with 20/20 hindsight.  *See Xerxes Corp.,* 639 F.3d at 669.  Were it otherwise, an employer could never prevail on summary judgment if its remedial measure failed to prevent a reoccurrence of harassment.  The Fourth Circuit has made clear that "an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law."  *See id.*

Alternatively, the EEOC may argue that UFP Ranson should have had a more severe response to A. Stitt's second complaint.  Such an argument fails for several reasons.  As an initial matter, A. Stitt's second complaint was made to a coworker—not her supervisor.  SUMF, ¶¶ 57-58.  In any event, when she made her second complaint, A. Stitt requested that she be permitted to work exclusively with her sister or cousin going forward, because that is what would make her comfortable.  *Id.* at ¶¶ 59-60.  It is beyond dispute that following her second complaint, A. Stitt was assigned to work only with her sister and, never again had to work in close proximity to the employee who made the inappropriate comments.  *Id.* at ¶¶ 61-62.  Thus, UFP Ranson's responses to A. Stitt's complaints were adequate as a matter of law. *See Xerxes Corp.*, 639 F.3d at 669.

Like her sister, P. Stitt made only one report of race-based conduct or comments to her supervisor.  SUMF, ¶¶ 85-87.  Specifically, P. Stitt reported to her supervisor that a coworker, Frank Spina, used the N-word and mocked and made fun of Spanish-speaking Hispanic

employees.  *Id.*  UFP Ranson initiated a prompt investigation, which included the investigator interviewing P. Stitt the very next day.  *Id.*  It is undisputed that following completion of that investigation, Spina's employment was terminated for using racial slurs and making racially insensitive and offensive comments in violation of the Equal Employment Opportunity, Non-Discrimination, Non-Harassment policy.  *Id.* at ¶ 7, 64.  As such, UFP Ranson's response to P. Stitt's complaint was adequate as a matter of law. *See Xerxes Corp.*, 639 F.3d at 669.

As for Giles, he testified that he never reported any race-based conduct or comments to his supervisor or any member of UFP Ranson's management.  SUMF, ¶ 117 (confirming that he never reported or complained of Christian or Bennett's comments, or any other race-based comments or conduct, to any supervisor or manager at UFP Ranson).  As Giles explained, he did not personally experience or witness any offensive racial epithets, racist jokes, race-based threats, or offensive or inappropriate race-based comments at UFP Ranson.  *Id.* at ¶ 104.  As such, his testimony makes clear that he had no alleged racial harassment to report.

According to Mullins, the only race-based conduct or comment that she ever reported was a Black hourly Safety Coordinator's statement, "If anyone is caught out in the yard without their safety glasses, he would be after them like a n----r getting out of jail," which was made during the safety portion of new-hire orientation and—while woefully misguided and unprofessional—was clearly intended to stress the importance of always wearing safety glasses. SUMF, ¶ 133.  UFP Ranson had no reason to believe that the Safety Coordinator would make other inappropriate race-based comments—much less that he would do so in the area where Mullins worked.  Under the circumstances, UFP Ranson had no reason to believe that formal disciplinary action was needed to prevent reoccurrence of the Safety Coordinator's inappropriate comment.  In contrast, disciplinary action would certainly have been warranted had Mullins

reported any of the Safety Coordinator's subsequent uses of the N-word.  Unfortunately, she did not.  *Id.* at ¶¶ 135, 138.  Because it had no knowledge of this conduct, UFP Ranson had no way to remedy it.

Finally, Styles testified that he made three reports of race-based comments to his supervisor.  SUMF, ¶¶ 152, 154.  Styles first reported to his supervisor that a coworker, Shaun Parsons, had called him a "porch monkey."  *Id*.  In response, Styles' supervisor changed his direct reports' assignments so that Styles would not need to work with Parsons.  *Id.* at ¶ 152.  As a result of the supervisor's remedial action, Styles never heard Parsons make another inappropriate comment and never had another negative interaction of any kind with Parsons.  *Id.* at ¶ 153.  Thus, UFP Ranson's response to Style's complaint about Parsons was adequate as a matter of law.  *See Xerxes Corp*., 639 F.3d at 669.  Styles also told his supervisor that a different co-worker, Austin Askew, had been greeting him with "what's up, my nigga."  *Id.* at ¶¶ 150, 154.  When Styles first reported the comment, his supervisor responded, "I'm going to take care of it."  *Id.*  When Askew continued using the same greeting, which Styles told him he found offensive, Styles made a second report to his supervisor, Terrance Morris (who is also Black), and Morris reiterated that he would take care of it.  *Id.*  It is not entirely clear what steps Morris took to address the issue; however, it is clear that whatever steps he took caused Askew's comments to stop.  *Id.* (Askew greeted Styles with "what's up, my nigga" every day until something caused it to stop after the 10th occurrence).  If Styles believed that Morris's response to his second complaint was also inadequate, why did he not raise the issue again or report it to someone higher in the chain of command, which Styles understood he could do?  *Id.* at ¶ 155.  The only answer is that Morris's response was adequate.

Thus, UFP Ranson promptly responded to all known incidents of alleged coworker racial harassment, and took remedial measures reasonably calculated to end the harassment in each such instance—and, in fact, did end the alleged harassment as to Ross, A. Stitt, P. Stitt, Giles, and Styles.  Accordingly, liability may not be imputed to UFP Ranson as a matter of law.  *See Xerxes Corp.*, 639 F.3d at 669, 675.

**2.      The race-based co-worker harassment experienced by each
claimant is not sufficiently severe or pervasive, as a matter law.**

The Supreme Court has explained that Title VII's prohibition against discriminatory harassment does not establish a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, 118 S.Ct. 998 (1998).  The Fourth Circuit has similarly explained that employers "cannot, of course, be charged with cleansing their workplace of all offensive remarks" because "[s]uch a task would be well-nigh impossible."  *Sunbelt*, 521 F.3d at 318.  Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275 (1998) (citations omitted).

To establish that harassment is sufficiently severe or pervasive so as to alter the terms or conditions of employment, a plaintiff must present evidence showing that "the workplace is *permeated with* discriminatory intimidation, ridicule, and insult."  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993) (emphasis added) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  Further, to meet the severe and pervasive requirement, the work environment must be objectively hostile and abusive, and the victim must actually perceive the work environment as hostile and abusive.  *Harris,* 510 U.S. at 22, 114 S.Ct. 367; *see also Boyer-Liberto*, 786 F.3d at 277; *Sunbelt*, 521 F.3d at 315.

The objective severity of the environment is judged from the perspective of a reasonable person in the victim's position, considering all of the circumstances. *Oncale*, 523 U.S. at 81-82 (holding that the plaintiff must demonstrate that the conduct was such that "a reasonable person in the [victim]'s position" would have found the environment hostile or abusive); *see also Boyer-Liberto*, 786 F.3d at 277. The circumstances to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 22, 114 S.Ct. 367; *see also Boyer-Liberto*, 786 F.3d at 277; *Sunbelt,* 521 F.3d at 315. Courts also consider the status of the harasser because it is well-settled that harassment by a coworker is less severe than harassment by a supervisor. *See Boyer-Liberto*, 786 F.3d at 278 ("a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.") (quoting *Rodgers v. W.S. Life Ins. Co*., 12 F.3d 668, 675 (7th Cir. 1993)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763, 118 S.Ct. 2257 (1998). In addition, the inquiry into objectively severe or pervasive abusive conduct must focus on the events that the plaintiff personally experienced. *Perkins v. Int'l Paper Co*., 936 F.3d 196, 210 (4th Cir. 2019) (holding that the experiences of others "about which the [victim] was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement.").

The Fourth Circuit has repeatedly stated the EEOC "must clear a high bar in order to satisfy the severe or pervasive test." *Xerxes Corp*., 639 F.3d at 676 (quoting *E.E.O.C. v. Cent. Wholesalers, Inc*., 573 F.3d 167, 176 (4th Cir. 2009)); *see also Sunbelt*, 521 F.3d at 315 ("Our circuit has likewise recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test."). "[C]onclusory statements, without specific evidentiary support, cannot

support an actionable claim for harassment, and that allegations unsubstantiated by accounts of specific dates, times or circumstances, are too general to suffice." *Id.* (quoting *Causey v. Balog*, 162 F.3d 795, 802 [4th Cir. 1998] and *Carter v. Ball*, 33 F.3d 450, 461–62 [4th Cir. 1994]) (internal quotation marks omitted). Likewise, "rude treatment by [coworkers]," *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003), and "difference[s] of opinion and personality conflict[s] with [one's] supervisor," *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 276 (4th Cir. 2000), are insufficient to satisfy the severe or pervasive test. *See Sunbelt*, 521 F.3d at 315-16. Thus, to survive summary judgment, the EEOC must present evidence "that the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *Xerxes Corp.,* 639 F.3d at 676. (quoting *Cent. Wholesalers*, 573 F.3d at 176).

There is no dispute that an employee's use of the "N" word is inappropriate and unacceptable, and courts have concluded that such words, even when isolated or used sporadically, may be sufficient to establish the severe or pervasive element—when made by the victim's supervisor. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 280 (collecting cases involving a supervisor's use of racial slurs); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [n----r] *by a supervisor* in the presence of his subordinates.") (emphasis added). In *Boyer-Liberto*, the Fourth Circuit distinguished cases which "involve a racial epithet directed at [the victim] by her supervisor," from cases, such as *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 336 (4th Cir. 2006), which involve "a racist remark that was made by a mere co-worker."

20

*Boyer-Liberto*, 786 F.3d at 281 (holding that "the district court improperly analogized this matter (involving a racial epithet directed at Liberto by her supervisor) to Jordan (concerning a racist remark that was made by a mere co-worker and not aimed at Jordan or any other employee)."). Here, none of the racial epithets were uttered by a supervisor or management official.  SUMF, ¶¶ 37, 41, 53, 56, 63, 85, 88, 111, 132, 150-151.

Ross told the EEOC that nobody at UFP Ranson ever used the N-word around him, and that nobody at UFP Ranson ever directed any racial remarks or jokes at him.  *Id.* at ¶ 37.  At deposition he testified that no UFP Ranson employee ever attempted to threaten or intimidate him, and that no UFP Ranson employee ever treated him less favorably than a White coworker. *Id.* at ¶ 38.  He also testified that he never witnessed anyone else at UFP Ranson being treated unfairly or inappropriately.  *Id.*  Thus, based solely Ross's own statements, any racial harassment he experienced is not sufficiently severe or pervasive, as a matter law.  Even if the Court were to accept Ross's testimony—in direct contradiction to his statements to the EEOC—that he was exposed to three inappropriate race-based comments during his three stints at UFP Ranson, his claim still fails.  The first comment, in the spring of 2018 (during Ross's first stint), involved a coworker's use of the N-word.  *Id.* at ¶ 41.  Then, in late 2018, after almost a year—during which Ross voluntarily resigns his employment to take a job with another employer and then quits that job to come back to UFP Ranson—Ross hears a different coworker use the N-word.  *Id.* at ¶¶ 30-31, 41.  Finally, a few months later, in the early 2019, Ross hears a third coworker use the N-word.  *Id.* at ¶ 41.  Despite hearing these comments, Ross, after being terminated for being off company property while on the clock, returns to UFP Ranson to plead with Garrison to give him another chance and hire him back for a third stint.  *Id.* at ¶¶ 31-32.  This is not the behavior of someone who perceives his work environment as subjectively hostile and abusive.  Moreover,

consideration of the relevant circumstances shows that the racial harassment Ross experienced is also not objectively severe.  *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 277-78 (considering the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and whether the harassment is by a supervisor).  Ross experienced three comments over the course of more than a year, none of the comments were physically threatening or humiliating, Ross testified that he was at all times able to satisfactorily perform his job duties, and none of the commenters were supervisors.  Accordingly, the racial harassment that Ross experienced is not sufficiently severe or pervasive, as a matter law.  *See Boyer-Liberto*, 786 F.3d at 277-78.

The racial harassment that A. Stitt experienced is also not sufficiently severe or pervasive, as a matter law.  A. Stitt was subjected to two inappropriate race-based comments.  In her first two weeks, a coworker told Stitt, "I don't like working with n----rs."  SUMF, ¶ 53.  Then two to three weeks later, the same coworker called her a "Black motherfucker."  *Id.* at ¶ 56.  A. Stitt testified that, outside of these two comments, she never had any racial epithets, including using the N-word, or any offensive or inappropriate raced-based comments directed at her at UFP Ranson.  *Id.* at ¶¶ 67-68.  As to whether this experience was subjectively severe and abusive, despite the comment directed at her in her first two weeks, A. Stitt helped convinced her sister and her cousin, both of whom are Black, to come work at UFP Ranson.  *Id.* at ¶ 71.  In addition, near the end of her employment (after she had been exposed to both inappropriate comments), A. Stitt was making and posting videos showing herself (and her sister) "having fun" while at work at UFP Ranson.  *Id.* at ¶ 70.  Thus, the EEOC cannot establish the subjective prong of the sever and pervasive element as to A. Stitt.  Nor can the EEOC establish the objective

prong because A. Stitt was exposed to only two comments and worked in close quarters with the offending employee on only two occasions for a total of just 10-12 minutes, none of the comments were physically threatening or humiliating, she was at all times able to satisfactorily perform her job duties, and the commenter was a coworker. *Id.* at ¶ 61.  Accordingly, the racial harassment that A. Stitt experienced is not sufficiently severe or pervasive, as a matter law.  *See Boyer-Liberto*, 786 F.3d at 277-78.

The harassment experienced by P. Stitt is even less severe and pervasive than that experienced by her sister.  P. Stitt testified that no racial epithets, including the N-word, were ever directed at her, that no offensive or inappropriate raced-based comments of any kind were directed at her, that she never heard any racist jokes, that nobody attempted to threaten or intimidate her, and that she was not treated less favorably than any White employees.  SUMF, ¶ 82.  Nor did P. Stitt witness, or even hear about, racist jokes, attempts to threaten or intimidate, or Black employees being treated less favorably than White employees.  *Id.* at ¶¶ 83-84.  In fact, when questioned about a video of her working at UFP Ranson near the end of her employment, P. Stitt testified that the video showed her, her sister, and their cousin "having fun" and "chilling" while doing their jobs.  *Id.* at ¶ 94.  To be sure, any racial harassment that P. Stitt experienced at UFP Ranson is not sufficiently severe or pervasive, as a matter law.  *See Boyer-Liberto*, 786 F.3d at 277-78.

Giles similarly testified that no racial epithets, including the N-word, were ever directed at him, that no offensive or inappropriate raced-based comments of any kind were directed at him, that he never heard any racist jokes, that nobody attempted to threaten or intimidate him, and that he was never treated less favorably than any White employees.  SUMF, ¶ 104.  As to what he witnessed, Giles testified that he never heard a racist joke, and could not recall ever

witnessing any current or former UFP Ranson employee being treated less favorably than a coworker.  *Id.* at ¶ 105.  According to Giles, he did witness two instances of inappropriate race-based comments, not directed at him, which were made by two different White coworkers.  *Id.* at ¶ 106.  As to the uses of the N-word by Christian and Bennett, Giles testified that the words were not used in an angry, mean, or degrading way, and that he was not personally offended by their comments.  *Id.* at ¶¶ 112-115.  As such, Giles experienced two offensive comments over the course of six months, neither comment was physically threatening or humiliating, Giles was at all times able to satisfactorily perform his job duties, and neither of the commenters were supervisors.  *Id.* at ¶ 120.  Thus, application of the relevant factors reveals that the racial harassment that Giles experienced is not sufficiently severe or pervasive, as a matter law.  *See Boyer-Liberto*, 786 F.3d at 277-78.

Mullins testified that no current or former UFP Ranson employee ever made any racial epithets, including using the N-word, that were directed at her; that no current or former UFP Ranson employee ever told any racist or race-based jokes directed at her; that no current or former UFP Ranson employee ever threatened or attempted to intimidate her; and that no current or former UFP Ranson employee ever made any offensive or inappropriate raced-based comments of any kind directed at her.  SUMF, ¶ 127.  Mullins also testified that she never witnessed any current or former UFP Ranson employee tell a racist or race-based joke, and never witnessed any current or former UFP Ranson employee threaten or attempt to intimidate a Black employee.  *Id.* at ¶ 128.  In addition, Mullins was unable to identify any Black employee who was treated less favorably that a White employee or to whom inappropriate or offensive race-based comments were directed.  *Id.* at ¶ 129.  Mullins heard was a White coworker say the N-word out loud to nobody in particular on two occasions; and a Black coworker say the N-word

once in a safety meeting, three times out loud to nobody in particular, and one to his daughter during a heated, personal conversation.  *Id.* at ¶¶ 133, 136.  Unlike the other claimants, the frequency of the conduct Mullins experienced may be sufficient to enable a juror to conclude that one of the relevant factors weighs in her favor.  However, no reasonable juror could find in her favor on any of the other factors.  Mullins admitted that the comments were not directed at her, that they were not physically threatening or humiliating, and that she was able to satisfactorily perform her job duties at all times; and neither of the commenters were supervisors. Additionally, Mullins resignation email stating, "While my time was short with UFPI, I've made many friends and a lot of memories and have had many, many laughs," and further stating, "Thank you for your time, patience, consideration, I hate to leave," belies any claim that she might make the her work environment was hostile and abusive.  *Id.* at ¶¶ 140-141.  As a matter of law, the racial harassment that Mullins experienced is not sufficiently severe or pervasive. *See Boyer-Liberto*, 786 F.3d at 277-78.

Styles testified that nobody ever threatened or attempted to intimidate him, that he never heard any racist jokes, and that nobody at UFP Ranson ever treated him less favorably than a White employee.  SUMF, ¶ 149.  Styles further testified that he never witnessed anyone attempt to threaten or intimidate a Black employee, and never witnessed any Black employee be treated less favorably than a White employee.  *Id.* at ¶ 157.  According to Styles, a White coworker greeted him with "what's up, my nigga" approximately 10 times, and a different White coworker call him a "porch monkey" on one occasion.  *Id.* at ¶¶ 150-151.  Significantly, none of these comments affected Styles' ability meet, and exceed, the performance expectations for his job. *Id.* at ¶ 159. Applying the relevant factors, a reasonable juror might be able to find for Styles on the frequency factor, but no reasonable jury could find for him on any of the other factors.  Styles

himself admitted that the comments were not physically threatening or humiliating; testified that

not only was he able to satisfactorily perform his job, he excelled at it; and neither of the

commenters were supervisors.  As such, the racial harassment that Styles experienced is not

sufficiently severe or pervasive, as a matter law.  *See Boyer-Liberto*, 786 F.3d at 277-78.

Accordingly, this Court should conclude that, as a matter of law, the EEOC cannot

establish the third element of its racial harassment claims because no claimant's work

environment was "pervaded with discriminatory conduct aimed to humiliate, ridicule, or

intimidate."  *Xerxes Corp.,* 639 F.3d at 676*.* (quoting *Cent. Wholesalers*, 573 F.3d at 176).

### B.      Davis's Claims That He Was Terminated Because Of His Race And Alleged Protected Activity Fail As A Matter of Law.

When addressing discrimination and retaliation claims under Title VII, courts apply the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this framework, the plaintiff must first establish a

*prima facie* case of discrimination or retaliation.  *See Guessous v. Fairview Prop. Invs., LLC*,

828 F.3d 208, 216 (4th Cir. 2016); *see also McDonnell Douglas*, 411 U.S. 792.  If the plaintiff

presents a *prima facie* case, then the burden shifts to the defendant to proffer a legitimate non-

discriminatory or non-retaliatory reason for the adverse employment action.  *Id.*  If the defendant

is able to proffer such a reason, the burden shifts back to the plaintiff to prove that the proffered

reason is pretext for intentional discrimination or retaliation.  *Id.*

### 1.      The EEOC cannot establish a *prima facie* race discrimination case.

To present a *prima facie* race discrimination case, the EEOC must show Davis's

"(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment

action; and (4) different treatment from similarly situated employees outside the protected

class." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (citation

omitted), *aff'd* 566 U.S. 30, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012).  The EEOC cannot

establish the second or fourth elements.

      To create a triable issue of fact as to satisfactory job performance, the EEOC must

demonstrate that Davis "was performing [his] job duties at a level that met [UFP Ranson]'s

legitimate expectations at the time of the adverse employment action."  *Hill v. Lockheed Martin*

*Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), *overruled in part on other*

*grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119

(2009).  Critically, under this element, "it is the perception of the decision maker which is

relevant, not the self-assessment of the plaintiff."  *Evans v. Techs. Applications & Serv. Co.*, 80

F.3d 954, 960-61 (4th Cir. 1996) (citation and internal quotations omitted).

      On May 28, 2020, Davis signed his Employee Development Report, which advised him

that he needed to improve productivity and stop standing around socializing during working

time.  SUMF, ¶ 20.  Significantly, this was not the first time that this issue had been raised with

Davis.  *Id.* at ¶ 22.  Prior to Davis being issued the Employee Development Report, Safety

Coordinator, William Ramon (Black) advised Davis—on several occasions—that when

management walks the plant the first thing that they would hear as they approached the stacker

area was Davis talking loudly about something unrelated to work, which gave the impression

that Davis was not being productive.  *Id.* at ¶ 23.  In addition, Davis's supervisor, Reece, and the

facility manager, Garrison, both spoke with Davis on multiple occasions about the need to stop

standing around talking and improve production.  *Id.* at ¶¶ 20, 22.  Davis repeatedly ignored

these instructions.  *Id.* at ¶ 20.  The last straw was when Garrison witnessed Davis standing

around talking while the rest of the stacker crew was working not even two weeks after Davis

was presented his Employee Development Report. *Id.* at ¶¶ 24-25. As such, the EEOC cannot demonstrate a genuine issue of material fact regarding this third element.

As for the fourth element, the EEOC cannot show that Davis was treated differently than other similarly situated employees outside his protected class. *See Coleman*, 626 F.3d at 190. To do so, the EEOC must present a similarly situated comparator who received more favorable treatment. *Id.* at 191. Neither the EEOC nor Davis have identified any white comparator who, like Davis, repeatedly stood around engaging in personal discussions while other employees on his or her crew were working. To be sure, no such individual exists. Likewise, the record is devoid of any evidence of any employee—irrespective of race—who was placed on an Employee Development Plan and mere days later engaged in the very conduct they were advised to curtail who retained their employment. Without any such comparator evidence, the EEOC's discrimination claim on behalf of Davis fails as a matter of law. Accordingly, the EEOC cannot establish a *prima facie* race discrimination case on behalf of Davis.

> ## 2.    The EEOC cannot establish a *prima facie* race retaliation case.

To present a *prima facie* retaliation case, the EEOC must show that (1) Davis engaged in protected activity, (2) Davis suffered an adverse action, and (3) a causal relationship exists between the protected activity and the adverse action. *See Guessous*, 828 F.3d at 217. The EEOC cannot establish either the first or third elements.

"In the context of element one of a retaliation claim, an employee is protected when [he] opposes not only employment actions actually unlawful under Title VII but also employment actions she reasonably believes to be unlawful." *Boyer-Liberto*, 786 F.3d at 282. However, opposition activity is only protected if an employee's subjective belief is "objectively reasonable in light of the facts." *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003). Here, Davis identified

his protected activity as his advising Reece that he was going to go to the EEOC because he was not presented with his performance evaluation when he thought he should have been.  SUMF, ¶ __.  As an initial matter, Title VII does not regulate the time of when employees are presented with performance evaluations.  Further, there is no evidence that connects the timing of Davis's review with any race-based animus; therefore, any claim by Davis that Reece was acting with discriminatory intent is not objectively reasonable.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citing with approval treatise noting that "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" (internal quotation marks omitted)); *see also Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 609 (4th Cir. 1999) (holding that "personal opinion" that corporate board held discriminatory animus insufficient absent "specific factual examples supporting [that] opinion"), overruled on other grounds by *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

Moreover, the EEOC has not, and cannot, demonstrate a causal connection between Davis's threat to go to the EEOC and the decision to terminate his employment.  It is axiomatic that, to establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the decision maker was aware of the protected activity.  *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (explaining that "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").  Davis testified that the only person he told about going to the EEOC was Reece.  SUMF, ¶ 27.  The decision to terminate Davis's employment was made by Garrison.  *Id.* at ¶ 26.  Garrison explained that he made the decision when he observed Davis violate the express directive in his Employee Development

29

Plan.  *Id.*  Garrison and Reece testified that Reece had no involvement in the decision, and the record contains no evidence to suggest otherwise.  *Id.* at ¶ 28.  Accordingly, the EEOC cannot establish a *prima facie* retaliation case on behalf of Davis.

> **3.  The EEOC cannot present evidence from which a reasonable jury could conclude that UFP Ranson's reasons are a pretext.**

The decision to terminate Davis's employment was made because, despite opportunities to improve, he consistently failed to remain focused on the tasks assigned to him while on work time, and repeatedly engaged in personal conversations when he should have been performing his assigned duties.  SUMF, ¶¶ 20-26.  Viewing the record evidence most favorably to the EEOC, there is no evidence from which a reasonable jury could find that UFP Ranson's stated reasons are illegitimate or motivated by discriminatory or retaliatory animus.  *See McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817.  UFP Ranson has consistently maintained the reasons for Davis's discharge.  The record is devoid of any discriminatory or retaliatory animus on the part of the decision maker, Garrison.  To be sure, the EEOC cannot present any evidence demonstrating that Garrison engaged in any inappropriate or offensive race-based conduct, made any race-based comments, or exhibited any favoritism toward White employees.  In short, there is no evidence that could support a finding of pretext.  Accordingly, UFP Ranson is entitled to summary judgment on Count IV.

<u>**CONCLUSION**</u>

For the foregoing reasons, UFP Ranson respectfully requests that this Court grant its motion and enter summary judgment in its favor as to the racial harassment claims asserted by the EEOC.

Date: February 17, 2023

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

*/s/ Cory E. Ridenour*
Cory E. Ridenour
WV Bar No. 13455
cory.ridenour@ogletree.com
Richard L. Etter (admitted *pro hac vice*)
PA I.D. No. 92835
rick.etter@ogletree.com
One PPG Place - Suite 1900
Pittsburgh, PA 15222
412-394-3333

PHILILIPS, GARDILL,
KAISER & ALTMEYER, PLLC

Edward M. George, III
WV Bar No. 5419
nedgeorge@pgka.com
61 Fourteenth Street
Wheeling, WV 26003
304-232-6810

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

U.S. EQUAL EMPLOYMENT            )
OPPORTUNITY COMMISSION,          )
                                 )
            Plaintiff,           )
                                 )        Case No. 3:21-cv-149-GMG-RWT
      v.                         )
                                 )
UFP RANSON, LLC,                 )
                                 )
            Defendant.           )

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2023, a copy of the foregoing document

was served via the Court's ECF system on the following:

Casey M. Shea
U.S. Equal Employment Opportunity Commission
casey.shea@the EEOC.gov

Gregory A. Murray
U.S. Equal Employment Opportunity Commission
Gregory.Murray@the EEOC.gov

Ronald L. Phillips
Equal Employment Opportunity Commission
ronald.phillips@the EEOC.gov

Stephanie K. Savino
U.S. Attorney's Office
Stephanie.K.Savino@usdoj.gov

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

*/s/ Cory E. Ridenour*
Cory E. Ridenour